UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUPERCOM, LTD.,

                              Plaintiff,

          -against-

SABBY VOLATILITY WARRANT MASTER
FUND LTD. and WEDBUSH SECURITIES,
INC.,

                              Defendants.

---

Case No. 1:21-cv-02857-LAP

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW

**ATTORNEYS**

Representing SuperCom, Ltd.,

**Steven David Isser**
Law Offices of Steven D. Isser
305 Broadway, 7th Floor
New York, NY 10007
212-812-5096

**Adam Stewart Katz**
Goldberg Segalla, LLP
711 3rd Avenue #1900
New York, NY 10017
646-292-8700

Representing Sabby Volatility Warrant Master Fund Ltd.

**Thomas James Fleming**
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019
212-451-2300

**Katherine E. Mateo**
Olshan Frome Wolosky
1325 Avenue of the Americas
New York, NY 10019
212-451-2300

Contents

I.    Parties and Jurisdiction.................................................................................. 1
II.   The Governing Agreements .......................................................................... 1
III.  Claims at Trial ............................................................................................... 1
IV.   Applicable Law ............................................................................................. 3
      1.   Choice of Law ..................................................................................... 3
      2.   Breach of Contract .............................................................................. 3
           A.   Impossibility of Performance ..................................................... 4
           B.   Liquidated Damages ................................................................... 5
           C.   Presumption of Receipt ............................................................... 5
           D.   Mitigation .................................................................................... 6
           E.   Accrual of Damages .................................................................... 7
      3.   Fraud .................................................................................................... 7
      4.   Rule 10b-5 ........................................................................................... 7
      5.   Negligence ........................................................................................... 8
      6.   Declaratory Judgment ......................................................................... 8
V.    Claims ............................................................................................................ 9
      1.   Sabby's Claim for Breach of The Registration Rights Agreement ........ 9
           A.   Impossibility of Performance ..................................................... 10
           B.   Liquidated Damages ................................................................... 11
      2.   Claims for Breach of the Warrant and the SPA .................................. 14
           A.   Receipt of the Warrant Exercise ................................................. 19
           B.   Sabbath Receipt .......................................................................... 21
           C.   Objections Pursued at Trial ........................................................ 22
           D.   Mitigation .................................................................................... 25
           E.   Accrual of Damages .................................................................... 30
      3.   SuperCom's Fraud and 10b-5 Claims ................................................ 30
      4.   SuperCom's Negligence Claim ........................................................... 35
      5.   SuperCom's Declaratory Judgment Claim .......................................... 36
VI.   The Experts .................................................................................................... 36
VII.  Conclusion ..................................................................................................... 39

I.        Parties and Jurisdiction

1.   Plaintiff SuperCom, Ltd. ("SuperCom") is an Israeli corporation with its principal place of business in Tel Aviv, Israel. (Dkt. no. 1-1 ¶ 1.) SuperCom's shares trade on the NASDAQ Stock Market under the symbol "SPCB."

2.   Defendant Sabby Volatility Warrant Master Fund Ltd. ("Sabby") is a company formed under the laws of the Cayman Islands with its principal place of business in George Town, Cayman Islands. (Dkt. no. 1-1 ¶ 2.)

3.   Defendant Wedbush Securities Inc. ("Wedbush") is a broker dealer with headquarters in Los Angeles, CA. (Dkt. no. 118.) Wedbush was dismissed from the action by Order dated July 6, 2022. (Id.; dkt. no. 119.)

4.   This Court has jurisdiction over this action under 28 U.S.C. § 1441(b)(2). The Complaint was filed in State Court and raised claims under the Securities Exchange Act of 1934. Sabby properly removed the action to this Court on April 2, 2021. (Dkt. no. 1.) This Court has jurisdiction over Sabby's counterclaims pursuant to 28 U.S.C. § 1367 as the counterclaims are so related to the claims in the action within its original jurisdiction that they form part of the same case or controversy.

II.       The Governing Agreements

5.   On July 7, 2020, SuperCom and Sabby executed a Securities Purchase Agreement (the "SPA") and a Registration Rights Agreement (the "RRA"). (Defendant's Exhibit ("DX") A, B.) Pursuant to the SPA, SuperCom issued to Sabby the Ordinary Shares Purchase Warrant to acquire 1,480,000 shares at $1.70 per share (the "Warrant"). (DX C § 2(b).)

6.   Pursuant to the SPA, Sabby invested $1,998,000 in SuperCom, receiving 1,480,000 shares of common stock (the "Shares"). (SPA at SuperCom000455.)

III.      Claims at Trial

7.   At trial, Plaintiff SuperCom pursued five claims against Sabby:

- Fraud, arising out of Sabby's supposed representations through Robert Grundstein, Chief Operating Officer and General Counsel at Sabby, (Grundstein Direct Testimony ("Grundstein Direct") ¶ 1), to Wedbush and AST Financial ("AST"), SuperCom's broker dealer and transfer agent, respectively, that Sabby was authorized to purchase additional equity shares of SuperCom and that SuperCom had authorized the release of these shares (dkt. no. 1-1 ¶¶ 24-30);

- Breach of contract arising out of Sabby's allegedly obtaining equity shares of SuperCom without authorization in violation of the terms of the SPA and the Warrant;

- Negligence, arising out of Sabby's alleged failure to exercise reasonable care in the exercise of the Warrant (dkt. no. 1-1 ¶¶ 38-43);

- Violation of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, arising out of Sabby's alleged misrepresentation to Wedbush that Sabby had authority to purchase additional tradable equity shares of SuperCom pursuant to the Warrant and that SuperCom had authorized release of the shares (dkt. no. 1-1 ¶¶ 45-52); and

- For a declaratory judgment that SuperCom timely rejected Sabby's warrant exercise and that Sabby is not entitled to damages (dkt. no. 1-1 ¶¶ 53-57.)[1]

8. At trial, Sabby pursued two counterclaims against SuperCom:

- Breach of contract for liquidated damages arising out of SuperCom's alleged failure to file a registration statement and secure an effective registration statement within the time limits specified in the RRA (dkt. no. 11 ¶¶ 20-25, 30-50); and

- Breach of contract for compensatory damages arising out of SuperCom's alleged failure to honor Sabby's exercise of the Warrant (dkt. no. 11 ¶¶ 26-29).

---

[1] SuperCom's claim for defamation was dismissed by order dated February 17, 2022. (Dkt. no. 89.)

IV.     Applicable Law

1.   Choice of Law

9.   The SPA provides: "[a]ll questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York" (SPA art. V § 5.9.). The Transaction Documents include the SPA, the RRA, and the Warrant. (Id. at SuperCom 00420.) The RRA and the Warrant adopt those choice of law provisions. (RRA at SuperCom 00479; Warrant at SABBY_001065.)

10. The parties also waived their rights to a jury trial. (SPA art. V § 5.21.)

2.   Breach of Contract

11. To "plead a cause of action for breach of contract, a plaintiff usually must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." 34-06 73, LLC v. Seneca Ins. Co., 39 N.Y.3d 44, 52 (N.Y. 2022) (cleaned up).

12. "Duly executed stock warrants are contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period." Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 198 (N.Y. 2001). In Reiss, the warrants were enforceable according to their terms because they had "all the material provisions necessary to make them enforceable contracts, including number of shares, price, and expiration date, and were drafted by sophisticated and counseled business persons." Id. As New York's beloved former Chief Judge, the late Judith Kaye, wrote in W.W.W. Assocs. v. Giancontieri, "[a] familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." 77 N.Y.2d 157, 162 (N.Y. 1990).

A. Impossibility of Performance

13. "Under New York law, the defendant in a contract dispute has the burden to prove that non-performance is excused by impossibility." Clarex Ltd. v. Natixis Sec. Ams. LLC, 988 F. Supp. 2d 381, 393 (S.D.N.Y. 2013); Inter-Am. Dev. Bank v. NextG Telecom Ltd., 503 F. Supp 687, 696 (S.D.N.Y. 2007) (the "burden of showing impossibility is on the party seeking to excuse performance."). To excuse performance, "impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." Kel Kim Corp. v. Cent. Mkts, Inc., 70 N.Y.2d 900, 902 (N.Y. 1987) (citing 407 E. 61st Garage v. Savoy Fifth Ave. Corp., 23 N.Y.2d 275 (N.Y. 1986)); see also Bank of Am. Nat'l. Tr. & Sav. Ass'n v. Envases Venezolanos, S.A., 740 F. Supp. 260, 267 (S.D.N.Y. 1990), aff'd sub nom. First Nat. Bank Maryland v. Envases Venezolanos, 923 F.2d 843 (2d Cir. 1990); Posadas De P.R. Assoc. v. Condado Plaza Acquisition, 2021 NY Slip Op 31182(U), at *19 (Sup. Ct. Monroe Cnty. Apr. 14, 2021) (granting plaintiff's request for summary judgment and rejecting defendant's arguments of impossibility and frustration of purpose, in part, because defendant "reaffirmed the contract even after the event that it claims was unforeseeable began (the COVID-19 pandemic)" and thus "chose to accept the risks of the pandemic").

14. "[P]erformance of a contract will be excused if such performance is rendered impossible by intervening governmental activities, but only if those activities are unforeseeable." RW Holdings, LLC v. Mayer, 131 A.D.3d 1228, 1230 (2d Dep't 2015) (cleaned up). A party asserting impossibility "must show that the intervening act was unforeseeable, even if the intervening act consisted of the actions of a governmental entity or the passage of new legislation." BOCA Aviation Ltd. v. AirBridgeCargo Airlines, LLC, 2023 U.S. Dist. LEXIS 63610, at *64-65 (S.D.N.Y. Apr. 11, 2023) (quoting RW Holdings, LLC, 131 A.D.3d at 1230).

B.  Liquidated Damages

15. "The burden is on the party seeking to avoid liquidated damages . . . to show that the stated liquidated damages are, in fact, a penalty." JMD Holding Corp. v. Cong. Fin. Corp., 4 N.Y.3d 373, 380 (N.Y. 2005) (cleaned up).

16. "Parties to a contract have the right to agree to such clauses, provided that the clause is neither unconscionable nor contrary to public policy." Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc., 41 N.Y.2d 420, 424 (N.Y. 1977).

C.  Presumption of Receipt

17. "[A] presumption of receipt arises where . . . the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed." Youxin Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 597 F.3d 84, 92 (2d Cir. 2010) (citing Nassau Ins. Co. v. Murray, 46 N.Y.2d 828 (N.Y. 1978)). New York law "contains a presumption that a party has received an email when it is delivered to the party's email address in accordance with regular office procedures." Lockette v. Stanley, 2018 U.S. Dist. LEXIS 171156, at *9 (S.D.N.Y. Oct. 3, 2018) (citing Clearfield v. HCL Am. Inc., 2017 U.S. Dist. LEXIS 92362, at *2 (S.D.N.Y. June 14, 2017); Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985)). "To rebut this presumption, a litigant must show that 'routine office practice was not followed or was so careless that it would be unreasonable to assume that notice was mailed.'" Youxin Ma, 597 F.3d at 92 (citing Nassau Ins. Co., 46 N.Y.2d at 830). "Mere denial of receipt is insufficient to rebut the presumption." Id.; Lockette, 2018 U.S. Dist. LEXIS 171156, at *10 ("[A] plaintiff's mere denial of receipt of an email is insufficient."); Walsh v. Walsh, 175 A.D.3d 743, 744 (2d Dep't 2019) (an "unsubstantiated allegation that [defendant's] attorney never received a properly mailed notice of settlement . . . was insufficient to rebut the presumption of proper mailing and receipt arising from the affidavit of mailing as well as the email sent by his attorney's office manager acknowledging

receipt").

   D.  Mitigation

   18.  "New York's courts adhere to the universally accepted principle that a harmed plaintiff must

mitigate damages." Air Et Chaleur, S.A. v. Janeway, 757 F.2d 489, 494 (2d Cir. 1985) (citing

Wilmot v. State, 32 N.Y.2d 164, 168-69 (N.Y. 1973); Cornell v. T.V. Dev. Corp., 17 N.Y.2d 69, 74

(N.Y. 1966)). "It has long been the rule in New York that where there has been a breach of contract,

the party who suffers damage by reason of the breach has a duty to minimize the damages and any

award of damages should be reduced by any unnecessary increase in damages due to the failure of

the plaintiff to avoid them." Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams., 618 F. Supp. 2d

280, 306 (S.D.N.Y. 2009) (cleaned up). "It is the breaching party's burden to prove that a plaintiff

could have lessened its damages." Id. (cleaned up). "More specifically, the breaching party must

show that the plaintiff unreasonably failed to minimize damages." Id. (citing Fed. Ins. v. Sabine

Towing & Transp. Inc., 783 F.2d 347, 350 (2d Cir. 1986)). "However, if the course of action chosen

by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable

course of action that would have avoided further damage." Id. at 306-07. (quoting Fed. Ins., 783 F.2d

at 350); Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A., 176 F.3d 601, 609 (2d Cir. 1999)

(it is "appropriate for courts to focus not on the failure of the plaintiff to pursue the . . . alternative

courses of action suggested by [the] defendant but upon the reasonableness of the action which [the]

plaintiff did in fact take."). "[A] plaintiff is not required to take economically unreasonable steps, or

to engage in particular transactions identified by the breaching defendant." Korea Life Ins. Co. v.

Morgan Guar. Tr. Co., 2004 U.S. Dist. LEXIS 16436, at *20 (S.D.N.Y. Aug. 20, 2004); Carrols

Equities Corp. v. Villanave, 57 A.D.2d 1044, 1045 (4th Dep't 1977) ("duty to mitigate . . . does not

include an obligation to undertake extraordinary and costly measures") (cleaned up).

   19. A "breach victim is rarely required to accept a new offer in order to mitigate damages."

Korea Life Ins. Co., 2004 U.S. Dist. LEXIS 16436, at *21; Carlisle Ventures, 176 F.3d at 609 ("We doubt if any man should be required to contract a second time with one who has without cause breached a prior contract with him.") (cleaned up).

E. Accrual of Damages

20. A warrant holder's breach of contract claim can accrue when the issuer fails to honor a valid exercise. See, e.g., Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, 2014 U.S. Dist. LEXIS 85442, at *1 (S.D.N.Y. June 17, 2014), aff'd, 641 F. App'x 24 (2d Cir. 2016). Under New York law, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, 641 F. App'x 24, 26 (2d Cir. 2016) (cleaned up). "[T]he proper valuation for the [w]arrants was the date of the breach—the date [the issuer] failed to deliver the warrants." Id. (cleaned up).

3. Fraud

21. In order to state a claim for fraud under New York law, a plaintiff must prove: "a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V., 17 N.Y.3d 269, 276 (N.Y. 2011).

4. Rule 10b-5

22. SEC Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon any person, in
connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (cleaned up).

23. As the private Rule 10b-5 action has evolved, the Court has drawn on the common-law action

of deceit to identify six elements a private plaintiff must prove: "(1) a material misrepresentation or

omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission

and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5)

economic loss; and (6) loss causation." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258,

286, 286 n.1 (2014) (citing Amgen Inc. v. Conn. Ret. Plans and Tr. Funds, 568 U.S. 455, 460-61

(2013)).

### 5.  Negligence

24. "To state a claim for negligence, a plaintiff must sufficiently allege (1) a duty; (2) a breach of

that duty; (3) causation; and (4) actual injury." Aetna Life Ins. Co. v. Appalachian Asset Mgt. Corp.,

110 A.D.3d 32, 42-43 (1st Dep't 2013) (cleaned up).

25. However, "[i]t is a well-established principle that a simple breach of contract is not to be

considered a tort unless a legal duty independent of the contract itself has been violated" Clark-

Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (N.Y. 1987). Thus, a plaintiff must point

to a "legal duty independent of contractual obligations" that "may be imposed by law as an incident

to the parties' relationship." Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 551 (N.Y. 1992).

"[A]n ordinary arms-length business relationship under a contract," by itself, is insufficient "to

establish the duty . . . to support [a] negligence . . . claim[]." Iroquois Master Fund, Ltd. v. Cel-Sci

Corp., 2011 U.S. Dist. LEXIS 31977, at *10-11 (S.D.N.Y. Mar. 28, 2011) (cleaned up).

### 6.  Declaratory Judgment

26. Pursuant to 28 USC § 2201(a), "[i]n a case of actual controversy within its jurisdiction . . .

any court of the United States, upon the filing of an appropriate pleading, may declare the rights and

other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

<u>V.</u>     <u>Claims</u>

<u>1.</u>   <u>Sabby's Claim for Breach of The Registration Rights Agreement</u>

27. Pursuant to the RRA, SuperCom was obligated to register the Shares with the Securities and Exchange Commission ("SEC") for sale in the public markets in accordance with specific deadlines running from the Closing Date. In Section 2(a), SuperCom agreed to file a registration statement "[o]n or prior to the Filing Date," defined as "the 15th calendar day following the Closing Date," which was July 22, 2020. (RRA § 1.)

28. In Section 2(a), SuperCom further agreed: "[T]he Company shall use its best efforts to cause a Registration Statement filed under this Agreement . . . to be declared effective under the Securities Act as promptly as possible after the filing thereof, but in any event no later than the applicable Effectiveness Date." (<u>Id.</u> at SuperCom000466.) The "Effectiveness Date" is defined as "the 45th calendar day following the Closing Date," which was August 21, 2020. (<u>Id.</u> at SuperCom000463.)

29. Absent an effective registration statement, Sabby could not sell or dispose of the Shares in the public markets until passage of the six-month holding period under SEC Rule 144. (<u>See</u> Grundstein Direct ¶ 8.)

30. SuperCom did not file a registration statement by July 22, 2020, the fifteenth day after the Closing Date. (Deposition Transcript of Arie Trabelsi dated October 13, 2021 ("Trabelsi Tr.") 52:21-53:12).

31. SuperCom did not obtain an effective registration statement by August 21, 2020, the forty-fifth day after the Closing Date. (<u>Id.</u>)

32. The failure to meet each deadline was defined in Section 2(d) of the RRA as an "Event Date." (RRA § 2(d).)

33. Section 2(d) of the RRA provided Sabby with the following liquidated damages upon an

"Event Date" and on each monthly anniversary of an Event Date if uncured:

> [O] each such Event Date and on each monthly anniversary of each
> such Event Date (if the applicable Event shall not have been cured
> by such date) until the applicable Event is cured, the Company
> shall pay to each Holder an amount in cash, as partial liquidated
> damages and <u>not as a penalty</u>, equal to the product of 2%
> multiplied by the aggregate Subscription Amount paid by such
> Holder pursuant to the Purchase Agreement. If the Company fails
> to pay any partial liquidated damages pursuant to this Section in
> full within seven days after the date payable, the Company will pay
> interest thereon at a rate of 16% per annum (or such lesser
> maximum amount that is permitted to be paid by applicable law) to
> the Holder, accruing daily from the date such partial liquidated
> damages are due until such amounts, plus all such interest thereon,
> are paid in full. The partial liquidated damages pursuant to the
> terms hereof shall apply on a daily pro rata basis for any portion of
> a month prior to the cure of an Event.

(<u>Id.</u> at SuperCom000468) (emphasis added).

34. SuperCom did not file a registration statement for the Shares at any time. (Stipulated Fact Nos. 6-7.)

35. By January 8, 2021, the Shares were eligible for sale in the public markets under SEC Rule 144, and Sabby promptly disposed of the Shares. (DX T.)

### A.   Impossibility of Performance

36. SuperCom contends that it was unable to comply with the registration filing and effectiveness deadlines due to the COVID-19 pandemic because its auditors were based in the United States. (Witness Statement of Arie Trabelsi, ("Trabelsi Direct") ¶ 18.) It argued that immediately after the RRA was finalized, Israeli cases of COVID-19 started to surge and the Israeli government implemented new procedures and lockdowns to limit the spread of COVID-19. (<u>Id.</u> ¶ 17; Plaintiff's Exhibits ("PX") 23-27.) Arie Trabelsi testified that these procedures limited the ability of non-Israeli citizens to enter the country and limited Israeli citizens' ability to travel abroad. Thus, SuperCom argued, it was impossible for its auditors from the United States to visit SuperCom's offices, suppliers, and warehouse in Israel. (Trabelsi ¶¶ 18, 22; PX 23-27; Trial

Transcript ("Tr.") 99:13-23.)

37. Although he mightily resisted answering the question, Arie Trabelsi conceded at trial that SuperCom failed timely to file its F-20 report with the SEC by the extended date of June 30 – seven days <u>before</u> the RRA was executed – at least in part due to COVID-19. (<u>See</u> Tr. 95:17-99:11.)[2] Also, again resisting answering directly, Arie Trabelsi admitted that on July 6, 2020 – one day <u>before</u> the RRA was executed – Israel imposed a new set of, in his words, "partial lockdowns." (Tr. 100:20-101:21.)

38. Accordingly, the Court finds that the dangers of COVID-19 were known to the parties in advance of the July 7, 2020, execution date of the governing agreements and could have been guarded against in the contracts. Thus, SuperCom has failed to carry its burden of proving that its failure timely to file a registration statement and failure timely to obtain an effective registration statement are excused by the COVID-19 pandemic. <u>Kel Kim Corp.</u>, 70 N.Y.2d at 902 (to excuse performance, "impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract") (cleaned up).

    B.  <u>Liquidated Damages</u>

39. With respect to liquidated damages, Mr. Grundstein testified credibly that Sabby "bargained for both" the 15-day filing of the registration statement and the 45-day effective registration statement. (Tr. 289:14-291:9.) Indeed, he testified without contradiction: "it was the forefront of our negotiation with the company. . . . [T]he company . . . knew that [its] filing in 15 days and being effective in 45 days was extremely important to us. We actually paid 10 extra cents per share. We paid $1.35 per share rather than $1.25, which is 8 percent more, for the company to agree that the shares would be effective, would be filed, the registration statement would be filed 15 days earlier

---

[2] <u>See also</u> Tr. 97:24-98:1 ("Q. Right. And were you prevented from meeting the June 30 deadline by COVID-related problems? A. No, it's -- it – it's also because of COVID. . . .")

and that they would be effective 15 days earlier." (Tr. 287:13-20.)

40. Mr. Grundstein also testified without contradiction that quantifying the damages Sabby would suffer from having illiquid, that is, unregistered, shares was difficult. (Grundstein Direct at ¶ 12.) Those damages include "interest payments that [Sabby] had to make to the people that we borrowed shares from to be short," some $180,000, (Tr. 283:2-6); "access to money;"[3] and that Sabby's "prime broker gave us what we call a haircut or charges us margin," (Tr. 284:1-2).

41. Mr. Grundstein also testified that because the shares were not freely tradeable (because there was no effective registration statement), "Sabby was left with an illiquid position and deprived of other investment opportunities," (Tr. 282:7-12), but could not name a specific deal or investment it was unable to do because the firm's capital was tied up in SuperCom, (Tr. 282:16-19.) On redirect, however, Mr. Grundstein testified credibly and without contradiction:

> Q. What was the market for deals, like in the second half of 2020 as far as Sabby's investment targets?
>
> A. It was insane. We, you know, back in our normal, normal times, we would do eight to fifteen deals a month. We were doing eight or ten deals a day sometimes.
>
> Q. And if Sabby had had additional capital to invest in the second half of 2020, would Sabby have participated in some of those deals?
>
> A. We would have, and we would have participated in larger deals than we participated in.

(Tr. 297:22-298:6.)

42. The Court finds that the liquidated damages remedy in Section 2(d) was an estimate, made by the parties at the time they entered into their agreement, of the extent of the injury that Sabby would sustain as a result of breach of the agreement. They expressly agreed that those damages were "not .

---

[3] "A. There's the access to money. When we were -- instead of having our 1.5 million shares, which we spent -- we spent $2 million that we gave to SuperCom for shares. If we had bought registered shares, or as soon as the shares became registered, we would have access that money. So that $2 million, we didn't access to it for the entire six-month period that we waited for our, for our shares." (Tr. 283:15-21.)

12

. . a penalty." (RRA § 2(d).) Mr. Grundstein testified without contradiction that the parties negotiated the terms of the RRA and that SuperCom proposed that 1.5% be used in Section 2(d) and later agreed to 2% to close the deal. (Grundstein Direct ¶¶ 10-12; RRA § 2(d).) As noted above, he also testified credibly that without registration, Sabby suffered financial loss that was difficult to estimate at the time the RRA was signed and would be difficult to estimate today. Among other things, as noted, Sabby was left with an illiquid position for four and one-half months, depriving it of other investment opportunities, Sabby was unable to sell the shares in the public markets or to use them as collateral for margin loans, and Sabby was unable to cover its short positions with registered shares and incurred stock lending fees as a result. The Court finds that the amount of the liquidated damages is not disproportionate to Sabby's potential for loss as a result of not having registered freely trading shares by August 21, 2020, and that SuperCom has not carried its burden of showing that the liquidated damages are unconscionable or contrary to public policy. Thus, the Court finds that the liquidated damages provided for in the RRA are not a penalty. Truck Rent-A-Car., 41 N.Y.2d at 424.

43. The Event Date for failing to file a registration statement resulted in $39,960 in liquidated damages under Section 2(d), calculated as 2% of $1,998,000. There were five monthly anniversaries of that Event Date, August 22 through December 22, 2020, each resulting in another $39,960 in liquidated damages and a partial month of 17 days ending on January 8, 2021, resulting in $22,644 in liquidated damages. The total liquidated damages for the failure to file a registration statement is $262,404, exclusive of interest. (DX AA.)

44. The Event Date for failing to have an effective registration statement also resulted in $39,960 in liquidated damages under Section 2(d). There were four monthly anniversaries of that Event Date, September 21, through December 21, 2020, each resulting in another $39,960 in liquidated damages and partial month of sixteen days ending on January 8, 2021, resulting in $23,976 in liquidated

damages. The total liquidated damages for the failure have an effective registration statement is $223,776 exclusive of interest. The total amount of liquidated damages, exclusive of interest is $486,180. (DX AA.)

45. Under Section 2(d) of the RRA, liquidated damages accrue interest at 16% per annum. (RRA § 2(d).)

46. For the reasons set out above, the Court finds that Sabby has proved its claim for liquidated damages arising out of SuperCom's breach of the RRA.

2.  Claims for Breach of the Warrant and the SPA

47. The Warrant provides in Section 2(a) as follows:

> Exercise of the purchase rights represented by this Warrant may be made, . . . by delivery to the Company of a duly executed facsimile copy or PDF copy submitted by email (or e-mail attachment) of the Notice of Exercise in the form annexed hereto (the "Notice of Exercise").

(Warrant § 2(a).)

48. On Friday, March 19, 2021, at 8:42 a.m., Robert Grundstein of Sabby sent an email to Arie Trabelsi and Ordan Trabelsi of SuperCom advising "[w]e may exercise some of our warrants cashless today – DWAC delivery by the company here is required in T+2, please confirm that AST and company are ready to do so." (DX F; Grundstein Direct ¶ 21.)

49. Arie Trabelsi was then SuperCom's CEO, and Ordan Trabelsi, his son, was President of SuperCom, Inc., SuperCom's subsidiary in the United States. (Trabelsi Tr. 7:9- 8:18.) The email was also sent to Wedbush, Sabby's prime broker. (DX F.)

50. Later that morning, Mr. Grundstein exercised the Warrant by sending an executed exercise notice in PDF and a screenshot of the trading price used for the exercise. (DX G; Grundstein Direct ¶ 22.) Sabby sent the exercise notice via email at 11:23 a.m. EST to Arie Trabelsi and Ordan Trabelsi with a copy to Wedbush. (DX G)

51. At 11:28 a.m., Mr. Grundstein sent a follow up email to the same persons, advising:

> Calculation for your convenience:
>
> [($2.94 - $1.70) * 1,480,000] / $2.94 = 624,217
>
> Please let us know if sufficient for us to have our prime broker shred the warrant and confirm this was done, or if you would like it returned to you. Of course by the warrant terms return is not needed to process exercise, though we are required to do so as a matter of course.

(DX H; Grundstein Direct ¶ 24.)

52. Mr. Grundstein testified that Sabby did not receive a bounce back on any of its March 19 emails to Arie Trabelsi and Ordan Trabelsi. (Grundstein Direct ¶ 27.) He also testified that Sabby used the email address for Arie Trabelsi that it had used without incident in the past and that this was the address set forth in the SPA. (See Grundstein Direct ¶ 23; SPA at SuperCom000454; see also Trabelsi Tr. 25:16-26:3.) Mr. Grundstein also testified that Sabby's emails to these same addresses on dates after March 19, 2021 were all received. (Tr. 203:8-9.)

53. Doreen Pappas of Wedbush was copied on the emails that Mr. Grundstein sent to SuperCom on March 19, 2021. (Grundstein Direct ¶ 22.) Ms. Pappas sent two emails by "reply all," each of which also copied SuperCom. (Id. ¶ 25.) One email sent at 11:25 a.m. advised, "I'll seek DWAC deposit approval for 624,217 SPCB." (DX I.) The next email, sent at 12:56 p.m. EDT, stated, "[w]e have posted the DWAC deposit, please have AST approve." (DX J.)

54. DWAC is an acronym for Deposit and Withdrawal at Custodian, a service that permits electronic transfers of shares from an issuer to a broker dealer. (Deposition Transcript of Doreen Pappas dated November 3, 2021 ("Pappas Tr.") 10:13-17.) Mr. Grundstein testified without contradiction that in order for a broker dealer to receive shares under this system, it must post a

DWAC receive notice. (Tr. 248:11-24;[4] see also Pappas Tr. 30:6-14.) The transfer agent decides whether or not to send shares after seeing the notice. (Grundstein Direct ¶ 29.)

55. Wedbush did not receive a bounce back on any of its March 19 "reply all" emails. Wedbush sent emails to the same addresses for Arie Trabelsi and Ordan Trabelsi on March 22 and March 23 without incident. (Pappas Tr. 51:7-21.)

56. Mr. Grundstein responded to the first Wedbush email by reply all at 11:31 a.m., "Thank you Doreen." (DX J; Grundstein Direct ¶ 25.) Ms. Pappas does not recall seeing any bounce backs or error messages for emails she sent in connection with the Sabby Warrant exercise, and, to the best of her knowledge, the emails she sent to Arie Trabelsi went through. (Pappas Tr. 51:7-21.)

57. Arie Trabelsi testified that he did not receive Mr. Grundstein's March 19 emails of 11:23 a.m. and 11:28 a.m. (Trabelsi Direct ¶ 32; Tr. 41:12-25; 45:8-13; 179:13-180:2.)

58. On March 22, Mr. Grundstein emailed Arie Trabelsi asking him to "acknowledge receipt and confirm shares will be delivered." (PX 17 at Wedbush_00094-95; Tr. 180:3-5.) On March 22, at 9:16 a.m., Arie Trabelsi emailed: "Receipt of what?" (PX 17 at Wedbush_00094; Tr. 180:3-5.)[5] Mr. Grundstein replied: "Our cashless exercise notice we submitted on Friday." (PX 17 at Wedbush_00094; Tr. 180:8-9; 200:9-22.) Immediately thereafter, Mr. Grundstein wrote to Arie Trabelsi: "Shares are due tomorrow by DWAC – [liquidated] damages will begin to accrue should

---

[4]"Q. And in this email [Tuesday, March 23 at 9:44 a.m.] you are telling Doreen to put up a DWAC, correct?
A. A DWAC receive.
Q. Is there a difference between a DWAC and a DWAC receive?
A. Very big difference, yes. We are putting up a receive. We do not have authority to create a DWAC, the transfer agent to match a DWAC. We are just asking -- we are asking our prime broker to put up a receive so that the issuer, who we are expecting -- who owe us shares, they can't deliver the shares unless we put up a receive. So I'm asking my broker, as I've done tens of thousands of times over twelve years, to put up a DWAC receive to enable the issuer and its transfer agent to deliver shares to us."
(Tr. 248:11-24.)

[5] Arie Trabelsi testified that he did not scroll down the thread from Mr. Grundstein's email, (Tr. 188:13-22), which contained the Warrant exercise, (PX 17 at Wedbush_00096).

you fail to deliver tomorrow and we will enforce them should another breach occur." (PX 17 at

Wedbush_00093.)

    59. At 2:13 p.m., Arie Trabelsi wrote back:

> STOP with your [threat]!!
> I asked you,
> "Receipt of what"
> I **have not received any answer!**
> Again, what are you asking for?
> What shares are you [talking] about? [Y]ou received all shares 1.45m free and
> tradable shares 3 months ago!
> You continue with your [threats] aim[ed] at causing supercom damages, which by the
> way, is against the Israeli law as for shareholder responsibility."

(PX 17 at Wedbush_00093; Tr. 180:16-23.)

    60. Mr. Grundstein re-transmitted the notice of exercise to Arie Trabelsi multiple times on March

22, 2021. (Grundstein Direct ¶ 27.)

    61. On Tuesday, March 23, Mr. Grundstein wrote to Wedbush on the same email chain with

SuperCom: "please put up the DWAC receive [sic] described in the email below that I sent on

Friday morning (and that you clearly received and replied to on Friday morning). Shares are due

today. Hopefully the company will live up to [its] contractual obligations." (Id. ¶ 28; DX K.)

    62. Shortly after, Wedbush wrote to AST: "DWAC deposit for 624,417 SPCB for Sabby has

been posted, please have [AST transfer]." (DX L.) Approximately two hours later, Wedbush wrote

to AST again: "[w]e do not see Sabby Volatility Warrant Master Fund's DWAC Deposit for 624,217

SPCB (SuperCom) being approved yet. Would someone from AST please provide an update?" (DX

M.)

    63. Minutes later Arie Trabelsi, wrote to AST and Wedbush (but not Sabby), as follows:

> Doreen!
> What you are doing is illegal!
> What you are doing is against the law!
> We never authorized these share issuance!

(DX N; Tr. 53:18-24.)

64. AST wrote back to Wedbush, with a copy to Arie Trabelsi: "The shares were delivered to the broker today. You need to instruct the broker to reverse the DWAC transaction for the 624,217 shares and have those shares returned to AST immediately." (DX U; Pappas Tr. 45:21-46:22.)

65. Less than one hour later at 1:13 p.m., Mr. Grundstein wrote to Arie and Ordan Trabelsi by email:

> We see the shares in our account, thank you for honoring your contractual obligations – it is good to avoid further litigation between our firms, we were flummoxed as to why you were refusing to honor our perfectly submitted cashless exercise. I am sure you are relieved as we are that we no longer own any of the securities from our transaction last year.

(DK P and Q.) Wedbush and AST were copied on this email.

66. When questioned about this email at trial, Mr. Grundstein conceded that, at the time he sent it, he was aware that SuperCom had not authorized delivery of the shares. (See Tr. 265:3-266:24.) When asked if the email was untruthful when written, Mr. Grundstein said that it was "sarcastic and sincere," (Tr. 267:24), and that he "sincerely hoped that the company would honor the exercise and not . . . request the shares to be returned." (Tr. 268:5-7).[6] Shortly thereafter, Mr. Grundstein wrote to

---

[6]"Q. Let's turn to Exhibit 12, please. This was written on March -- I'm looking at 33970. It's the email on March 23 at 1:13 from you to Arie. And you write: Arie and Ordan, we see the shares in our account. Thank you for honoring your contractual obligations. It's good to avoid further litigation between our firms. We were flummoxed as to why you were refusing to honor our perfectly submitted cashless exercise. I am sure you are relieved, as we are, that we no longer own any of the securities from our transaction last year. We should like to return the fully exercised warrant, or would it be acceptable to have Wedbush shred it and confirm that it has done. This email is completely untruthful at the time it was written, correct?
A. It was sarcastic and sincere.
Q. I don't understand how it could be both sarcastic and sincere at the same time.
A. Sincerely, I knew that the company had not agreed to deliver the shares. At the same time -- it was sarcastic in that it wasn't true, but at the same time it was sincere, the shares had been delivered, and I sincerely hoped that the company would honor the exercise and not -- and not request the shares be returned.
Q. So it was your intention in this email that the company would read it and think you knew they hadn't approved the transfer and you were being sarcastic? Is that the intent behind this email?
(footnote continued)

18

Hal Mintz, Sabby's Chief Investment Officer: "Give him a chance to do the right thing, now that it has already been done, and lay out the reasons he should be happy it was done without hi[s] knowing. We know he is kicking and screaming." (Tr. 269:5-8.)

67. Around this time, Arie Trabelsi called AST to say SuperCom did not authorize the transfer. (Trabelsi Tr. 170:18-171:18; 183:8-184:13.)

68. After Mr. Grundstein's email, AST wrote to Arie Trabelsi "Are you honoring the 624,417 DWAC request?" to which Arie Trabelsi replied, "No." (DX R at AST_000011.)

69. Wedbush returned the shares electronically to AST that same day. (DX S.) Arie Trabelsi conceded that "Sabby returned the shares on the same day that they were delivered." (Tr. 55:7-11.) Mr. Grundstein testified: "the Wedbush transfer was not publicly reported and no one would have known about it except for the parties involved. The shares were in Sabby's account for an hour or two and Sabby derived no financial benefit from holding them for this brief period." (Grundstein Direct ¶ 32.)

70. After SuperCom rejected Sabby's Warrant exercise, Arie Trabelsi "offered Sabby just to submit a new exercise. And later on, a day after that, when [Sabby] didn't submit a new one [he] offered again to Sabby to submit a new warrant exercise." (Tr. 185:18-24.)

A. Receipt of the Warrant Exercise

71. As noted above, Arie Trabelsi testified that he did not receive Mr. Grundstein's March 19 emails of 11:23 a.m. and 11:28 a.m. on March 19. (Trabelsi Direct ¶ 31; Tr. 41:12-25; 45:8-13;

---

(continued)
A. Yes.
Q. And you did not think that they would think you were writing an email that you truly believed the company had approved the transfer?
A. Correct.
Q. You think, based on this email, they would know that you know that the company had not approved the transfer?
A. I did."
(Tr. 267:10-268:19.)

197:16-180:2.)

72. However, PX 10 shows Arie Trabelsi's responding on an email thread that includes Sabby's notice of exercise. (PX 10 at SABBY_003774-75.) During discovery, SuperCom produced the same email thread, demonstrating that the exercise email was indeed received. (DX AD at SuperCom 00605-07.) At trial, Arie Trabelsi could not provide an explanation for this document. (Tr. 75:5-15; 77:6-24.)

73. Arie Trabelsi also testified about his "receipt of what?" email at 9:16 a.m. on March 22 and said that he did not scroll down in the thread to see the earlier emails Mr. Grundstein had sent to him, which included the notice of exercise. (Tr. 189:7-23, 190: 7-11; see also Tr. 46:21-24; 188:6-22; 189:7-11.)

74. The only search of SuperCom's emails to determine if Sabby's March 19 emails were received was conducted by Arie Trabelsi. (Dkt. no. 81; Tr. 72:1-3; 7-21.) No forensic search was performed.

75. The absence of a credible search and a credible explanation for the alleged non-receipt is compelling evidence that the electronic communications transmitting Sabby's cashless exercise notice were indeed received by Arie Trabelsi on March 19, 2021. The evidence shows that Sabby's March 19 emails were sent to the email address designated in the SPA and used successfully both before and after the March 19 emails in accordance with regular office procedures. Thus, the Court finds that Arie Trabelsi's denial of receipt of the March 19 emails is insufficient to overcome the presumption that Sabby's March 19 emails, sent to the email address designated in the Warrant, an address used both before and after the Warrant exercise without incident, were received. Youxin Ma, 597 F3d. at 92 ("Mere denial of receipt is insufficient to rebut the presumption."); see Clearfield v. HCL Am. Inc., 2017 U.S. DIST. LEXIS, at *2 (New York law contains "a presumption that a party has received [an email] when . . . [it is delivered] to the party's [email]

20

address in accordance with regular office procedures.") (cleaned up). Accordingly, the Court does not credit Arie Trabelsi's testimony that he did not receive Mr. Grundstein's March 19 emails and finds that the emails were in fact received.[7]

### B.  Sabbath Receipt

76.  SuperCom has also complained that some or all of these emails would have arrived at its office in Israel after sundown on Friday, March 19, a fact that would make it impossible for an observant Jewish person to read the emails when received. (Tr. 80:25-81:9.) The Warrant, however, permits exercise on any day, (Warrant at SABBY_001061), as Arie Trabelsi eventually conceded, (Tr. 82:22-25; 84:6-13). Mr. Grundstein testified without contradiction that even if the exercise notice arrived on the Sabbath, Friday, March 19, "[b]ecause delivery is required 'T+2', meaning, two trading days after exercise, SuperCom was required to deliver the shares by Tuesday, March 23. Arie and Ordan Trabelsi could have read and responded to [Mr. Grundstein's] email on Sunday, March 21 or Monday, March 22 without running afoul of the Warrant deadlines." (Grundstein Direct ¶ 26.) In fact, SuperCom did not respond to the Friday, March 19, emails until Monday, March 22. (Id. at 27.)

77.  In any event, there is no prohibition in the Warrant for exercise on the Sabbath, and Arie

---

[7] The Court notes other examples of Arie Trabelsi's less than accurate testimony:
- "Sabby quickly dumped all the shares they took from SuperCom illegally and caused the share price of SuperCom to decease . . ." (Trabelsi Direct ¶ 59.) In fact, Sabby returned the shares, and SuperCom's share price increased from March 23 through the end of the month. (DX Z).
- The transfer and return of shares "caused damage to SuperCom's share price, SuperCom's ability to raise capital and its relationship with AST." (Trabelsi Direct ¶ 63). Not even SuperCom's expert claimed damage to the share price, which in fact trended upward after March 23, 2021. (DX Z.) SuperCom offered no evidence of any inability to raise capital and indeed raised $7 million in June 2021 and another $4.2 million in February 2022. (PX 21 ¶ 26-29).
- Arie Trabelsi insisted that Sabby's action in March 2021 "caused" SuperCom to "take a very expensive loan" in February 2021 – a month before the actions complained of. (Tr. 70:2-71:5.)

Trabelsi eventually acknowledged that Sabby could exercise the warrant on Friday. (Tr. 84:11-13.) Accordingly, the Court rejects this complaint.

  C. Objections Pursued at Trial

78. Aside from pretending that it did not receive Sabby's notice of exercise and proffering a variety of other excuses, (Tr. 80:19-81:20; 84:17-87:10 (SuperCom had to be able to acknowledge receipt within two hours)), SuperCom eventually pursued two; the "144 paperwork" and the "timing of the exercise." (Tr. 87:11-14.)[8]

79. First, the Warrant provides, "[SuperCom] shall deliver any objection to any Notice of Exercise within two (2) Business Days of receipt of such notice." (Warrant § 2(a).) Arie Trabelsi testified SuperCom expressed its objections to Sabby's exercise of the warrant in its emails to Sabby within two business days of the March 23 exercise. (Tr. 78:2-18.) The two supposed objections offered in evidence, (PX 10 and PX 17), do not reference either defense advanced at trial. The email dated March 22 at 2:57 p.m. reads, "No transaction of shares was approved or in process." (PX 10 at SABBY_003772.) Arie Trabelsi's email sent at approximately the same time advised "STOP with your [threat]!! . . . You continue with your [threats] aim[ed] at causing supercom damages, which by the way, is against Israeli law as for shareholder responsibility." (PX 17 at Wedbush_00093.) Neither email mentions the objections SuperCom pursued at trial. Thus, the Court finds that the objections pursued at trial are untimely under the terms of the Warrant. W.W.W. Assocs., 77 N.Y. 2d at 162 ("[W]hen parties set down their agreement in a clear complete document, their writing should as a rule be enforced according to its terms.").

80. Second, even if the objections raised at trial were raised timely, they are still without merit. As to the "Rule 144 paperwork," SuperCom argues that Sabby was required to provide a legal opinion and a representation letter with the notice of exercise, purportedly to satisfy SEC Rule 144,

---

[8] "It's artificially, illegally exercised the terms at 11:24, while using the bid of 9:30." (Tr. 87:13-14.)

17 C.F.R. § 230.144. (Trabelsi Direct ¶ 46; Tr. 48:9-16; 51:16-21; 88:11-89:16.) However, Section 2(a) of the Warrant provides, "[e]xercise of the purchase rights represented by this Warrant may be made . . . by delivery to the Company of a . . . PDF copy submitted by e-mail (or e-mail attachment) of the Notice of Exercise in the form annexed hereto." (Warrant § 2(a).) It says nothing about any Rule 144 paperwork, and once Sabby complied with Section 2(a), it had made a valid exercise according to the terms of the Warrant.

81. If Rule 144 paperwork were required, SuperCom could have requested such after exercise of the Warrant and before delivery of the shares. Mr. Grundstein testified that if requested, Sabby would have complied, just as it had done previously. (Tr. 227:11-21.) But SuperCom made no such request. Thus, the Court finds the "Rule 144 paperwork" objection to be without merit.

82. As to the timing of the exercise, SuperCom contends that Mr. Grundstein did not execute the notice of exercise at 9:30 a.m. on March 19, the time of the most advantageous bid price, but did so after the 9:30 a.m. high bid price when he saw the direction the price was heading. (SuperCom Post Trial Memorandum at 2-3.) Mr. Grundstein testified, however, that he executed the notice of exercise at 9:30:

> Q. But you didn't execute the notice of exercise at 9:30, the time of that bid, did you?
> A. I executed it around 9:30. I completed and executed the form at 9:30. I need to do a calculation to actually figure out the number. I did that at 9:30, signed the form and had it ready to go, at which point we had two hours to decide if we were going to submit that form or not.

(Tr. 204:20-205:1.) [9]

---

[9] The Warrant provides for cashless exercise at:
> [T]he Bid Price of the Ordinary Shares on the principal Trading Market as reported by Bloomberg L.P ("Bloomberg") as of the time of the Holder's execution of the applicable Notice of Exercise <u>if such Notice of Exercise is executed during "regular trading hours" on a Trading Day and is delivered within two (2) hours thereafter</u> (including until two (2) hours after the close of "regular trading hours" on a Trading Day) pursuant to Section 2(a) hereof . . . .

(Warrant § 2(c)(A)(z).) (emphasis added.)

83. Mr. Grundstein was cross-examined heavily on this issue, including about one answer at his deposition that he did not recall when he executed the notice. (Tr. 205:2-208:17.)[10]

84. Mr. Grundstein was also cross-examined about an exchange of emails among Sabby executives in three different locations on the morning of March 19 (PX 7 at SABBY 003661-62, PX 8 at SABBY_003668-70), including one where he asked a colleague to confirm his calculation of the number of shares the Warrant formula yielded. (Tr. 219:20-211:25.)

85. With respect to the two-hour window in Section 2(c)(z) of the Warrant, Mr. Grundstein explained:

> Q. So I just want to be clear. It is your understanding that you could sign the warrant exercise and then just throw it away?
> A. Yes.
> Q. Okay. And just fill out a new one if the bid price goes up?
> A. Absolutely.
> Q. And do that all day?
> A. Correct.
> Q. Where does it say that in the warrant agreement, that once you execute the notice of exercise you don't have to submit it, and you can submit it --
> A. It says right there that we have two hours to submit the exercise.
> Q. Well, but it doesn't say you could just tear it up or not tell anyone about it. It just gives you a time period. Where does it say that once it's exercised you can then decide not to use it -- once it's signed, sorry -- you can decide not to use it?
> A. It doesn't say that I have to send it in. We have two hours to decide at that point.

(Tr. 208:18-209:13.)

86. Further to the two-hour window language in the Warrant, the Court inquired:

> THE COURT: [Section 2(c)(z) of the Warrant] talks about the bid price at the time of the holder's execution of the applicable notice of exercise if done certain certain and is delivered within two hours. So does "execute" mean sign it?
> THE WITNESS: Yes.
> THE COURT: Is that what that means?
> THE WITNESS: Yes.
> THE COURT: And "deliver" is when you essentially e-mail it to the issuer?
> THE WITNESS: Yes. We have two hours to submit it and actually effectuate the exercise.

---

[10] In post-trial briefing, Sabby cited other answers in Mr. Grundstein's deposition where he testified consistently with his trial testimony that he signed the Warrant exercise at 9:30 a.m. (Tr. 300:10-13; see also dkt. no. 162 at 9-10 (quoting Grundstein deposition).)

> THE COURT: What is the significance of the word "execution" then? I mean, it doesn't seem that it means anything other than some guy sitting at his desk signing his name.
> THE WITNESS: It's bad drafting, your Honor.
> THE COURT: All right. Okay. Thank you.

(Tr. 218:14-219:7.)

87. On balance, the Court was not persuaded by the cross-examination and credits Mr. Grundstein's testimony that he executed the Warrant exercise at or about 9:30 a.m. on March 19. As noted above, his email of the Warrant exercise to SuperCom shows that it was sent at 11:23 a.m., within the two-hour window provided in Section 2(c)(A)(z) of the Warrant. (DX G) While the two-hour window language in the Warrant might seem odd, whether due to poor drafting or something else, it is the contract these parties agreed to. That the language allowed Sabby to time its exercise exquisitely to take advantage of the highest bid price is of no moment; a contract is a contract. Accordingly, the Court finds that Sabby validly exercised the Warrant on March 19 at a bid price of $2.94, yielding 624,217 shares of SuperCom stock. As a consequence, the Court finds that SuperCom breached the Warrant by refusing to honor Sabby's exercise of the Warrant according to its terms. W.W.W. Assoc. v. Giancontieri, 77 N.Y. 2d at 162 ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms"). For the same reasons, the Court rejects SuperCom's breach of contract claim.

### D.  Mitigation

88. SuperCom argues that Sabby failed to mitigate any damages it might have suffered as a result of SuperCom's failure to honor Sabby's Warrant exercise. (Dkt. no. 164 at 19-20.) As noted above, Arie Trabelsi testified, and Mr. Grundstein confirmed, that Arie Trabelsi suggested that Sabby submit a new Warrant exercise, (Tr. 185:18-24; 271:6-10), albeit at the then-prevailing price, (Tr. 191:3-17).

89. When asked if Sabby could have exercised the Warrant on Wednesday, March 24, Mr.

Grundstein testified that he was not sure because he was not sure what the stock price was on Wednesday. "If it was below a dollar 70, we could not have exercised." (Tr. 276:6-7.) SuperCom's share price did in fact exceed $1.70 on March 24-26, 2021, and April 1, 2021. (DX Z.)

90. By then, however, Sabby had "concern" with respect to SuperCom. Sabby had already sued SuperCom in a New York State court for breach of the RRA.[11] At trial, when cross-examined about why he sent three emails to SuperCom in addition to the Warrant exercise when exercising the Warrant, Mr. Grundstein testified credibly that he was concerned:

> Q. Were you anticipating a problem with this warrant exercise being approved?
> A. I was concerned.
> Q. Why was that?
> A. Two reasons. First off, we had already had issues with this issuer regarding the registration rights, the failure to file, and then the failure to pay the liquidate the damages that were due for that, and now I have sent an email with an exercise notice. It's the next business day. When I'm asking for acknowledgment of receipt of that email, the response was, receipt of what? So I am now concerned that my exercise will not be honored.

(Tr. 201:1-13; <u>see also</u> Tr. 258:13-15 ("Well, it was unprecedented that I was receiving emails from the CEO of the company telling me that they had not received the exercise notice."); Tr. 255:5-6 ("The company not approving the valid warrant exercise was unprecedented.").

91. When asked about mitigation, Mr. Grundstein also testified credibly that Sabby did not know until the end of the day on Tuesday, March 23, the delivery date specified in the Warrant, that SuperCom would not deliver the shares and that Sabby remained hopeful throughout the day that SuperCom would do so. (Tr. 275:12-276:2.)

92. As an initial matter, the duty to mitigate "only arises after the purported breach has occurred." <u>Summit Health, Inc. v. APS Healthcare Bethesda, Inc.</u>, 993 F. Supp. 2d 379, 402 (S.D.N.Y. 2014) (citing <u>U.S. Bank Nat'l Ass'n v. Ables & Hall Builders</u>, 696 F. Supp. 2d 428, 441

---

[11] <u>See Sabby Volatility Warrant Master Fund Ltd. V. SuperCom Ltd.</u>, Index No. 654189/2020 (Sup. Ct. N.Y. Cnty.).

(S.D.N.Y. 2010) (Chin, J.)). SuperCom did not breach until close of business on March 23, 2021. Sabby had no obligation to mitigate until that time. Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc., 2017 U.S. Dist. LEXIS 20788, at *3 (S.D.N.Y. Feb. 10, 2017) ("A party to a contract has a right to expect performance and should not be tasked with arranging to ameliorate the impact of a breach until one actually occurs.").

93. In any event, given the state of affairs, where SuperCom had (1) failed even to file its registration statement (much less to obtain an effective registration statement), (2) had refused to pay the liquidated damages prescribed in the RRA for such failure,[12] and (3) incredibly represented that it had not received Sabby's Warrant Exercise, it was reasonable for Sabby to reject Arie Trabelsi's offer to exercise at a lower price. U.S. Bank Nat'l Ass'n, 696 F. Supp. 2d at 441 (the duty to mitigate "requires only reasonable, practical care and diligence, not extraordinary measures" and does not require "undue risk, burden, or expense."). Sabby was not required to accept the breaching party's offer, particularly when that breaching party was a serial breacher with a history of taking absurd positions as to its contractual obligations. Korea Life Ins. Co., 2004 U.S. Dist. LEXIS 16436, at *20-21 (A "[party] is not required to . . . engage in particular transactions identified by the breaching [party]" and a "breach victim is rarely required to accept a new offer in order to mitigate damages," particularly from the party had already breached the contract); Carlisle Ventures, Inc., 176 F.3d at 609 ("[w]e doubt if any man should be required to contract a second time with one who has without cause breached a prior contract with him."). As Sabby learned to its detriment, the very act of

---

[12] Indeed, even up to and including the trial, Arie Trabelsi refused to acknowledge SuperCom's breach of these provisions and maintained that, even though the parties agreed to an expedited registration period, a scrivener's error that resulting in the inclusion in the RRA of incorrect, and never agreed to, dates providing for a longer registration period exempted SuperCom from complying with its bargain. (Tr. 92:1-8 ("Q. Right. And the registration rights agreement had a deadline for SuperCom to file a registration statement, is that right? A. Yes. Q. And that was 15 days? A. Okay. It was 15, 45, 75, which we agreed during the process. We originally agreed to -- the document we signed was 45.").)

contracting with SuperCom was an "undue risk," and Sabby was not required to save itself from the frying pan by jumping into the fire. Sabby had good cause to be wary of accepting any invitation to treat by SuperCom, and refusing to do so was not unreasonable.

94. This is particularly so because Sabby would have been required to decide whether do so within a very short period. Giving SuperCom the benefit of the latest date that Sabby could have profitably exercised the Warrant after the breach, April 1, 2021, Sabby would have been required to make a decision within only nine days. (DX Z.) Though not directly on point, cases involving damages based on a conversion theory of non-delivery of stock allow the party who did not receive stock to which he was entitled to recover "the highest market value of the stock between the time of the breach and a reasonable time thereafter." Lucente v. IBM, 310 F.3d 243, 262 (2d Cir. 2002). "The purpose of the reasonable time rule is to allow the plaintiff 'reasonable opportunity to consult counsel, to employ other brokers and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase.'" Flickinger v. Harold C. Brown & Co., 789 F. Supp. 616, 620 (W.D.N.Y. 1992) (quoting Caballero v. Anselmo, 759 F. Supp. 144, 149 (S.D.N.Y. 1991)). It serves "as a limitation on recovery, since it reflects the duty to mitigate" Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 535 (S.D.N.Y. 2001).

95. Though these cases involved the wronged party's attempting to secure a higher measure of damages, limited by the principal that the wronged party must make that decision and mitigate by a reasonable time, the Court finds them persuasive in evaluating SuperCom's argument that Sabby failed to behave reasonably by failing to exercise the Warrants no later than April 1, 2021.

96. In addressing what constitutes a "reasonable time," courts have regularly found that at least ten days – and indeed frequently up to thirty days – is a reasonable time for the wronged party to evaluate whether to cover. Halifax Fund, L.P. v. Mrv Communs., 2001 U.S. Dist. LEXIS 20933, at

*21 (S.D.N.Y. Dec. 17, 2001) (three weeks reasonable); <u>Flickinger</u>, 789 F. Supp. at 620 ("[A]

'reasonable time' would be a relatively short period, perhaps ten days from the date of discovery.");

<u>Agamede Ltd. v. Life Energy & Tech. Holdings, Inc.</u>, 2007 U.S. Dist. LEXIS 4698, at *13

(E.D.N.Y. Jan. 23, 2007) (sixty days reasonable); <u>Mayer v. Monzo</u>, 221 N.Y. 442, 446-47 (N.Y.

1917) ("It has been held under varying circumstances that thirty days or fifteen days or sixty days

would be such reasonable period."). Among the factors that courts have considered relevant are the

complexity of the transaction, the volatility of the stock in question, recent market activity, the need

to consult with counsel, the size of the transaction, and the need to determine whether further

negotiation would be futile. <u>Halifax Fund, L.P.</u>, 2001 U.S. Dist. LEXIS 20933, at *23, *23 n.12. The

Court finds that at a minimum ten days was a reasonable time for Sabby to decide how to proceed. In

so finding, the Court takes into account (1) Sabby's adversarial relationship with SuperCom, (Tr.

299:4-16), which rendered critical the advice of counsel before Sabby transacted with SuperCom and

potentially implicated its rights, (2) the fact that over six hundred thousand shares were at issue,

(Arie Trabelsi Testimony ¶¶ 62-63), (3) the fluctuation in SuperCom's share price, swinging from

$1.57 to $2.95 and back down to $1.45 over the course of a month, (DX Z), and (4) that Sabby held a

large short position in SuperCom, (Tr. 298:20-299:3).

97. In any event, even if the Court did not affirmatively find that ten days was a reasonable time,

SuperCom has certainly not demonstrated that nine days was a reasonable time. All SuperCom has

done is point to the fact that the exercise of the Warrants would have been profitable on April 1,

2021, without pointing to any evidence showing that Sabby could reasonably have engaged in the

necessary diligence and analysis and acted by that date. Given that it is SuperCom that is attempting

to reduce Sabby's recovery, as opposed to Sabby's attempting to gain the benefit of a higher

recovery, the Court finds that SuperCom bears the burden of demonstrating that a "reasonable time"

for Sabby to make a decision about re-exercising the Warrant was no later than April 1, 2021.

Aristocrat Leisure Ltd., 618 F. Supp. 2d at 306 ("It is the breaching party's burden to prove that a plaintiff could have lessened its damages."). Thus, even if there was not evidence demonstrating that ten days was a reasonable time, which there is, SuperCom has not carried its burden of demonstrating that ten days was an unreasonable amount of time.

98. Accordingly, the Court finds that SuperCom has not carried its burden of showing that Sabby unreasonably failed to minimize its damages. Id. at 306-07 ("[T]he breaching party must show that the [wronged party] unreasonably failed to minimize damages.") (cleaned up).

99. For the reasons set out above, the Court finds that (1) SuperCom has not proved its claim against Sabby for breach of the SPA and the Warrant arising out of Sabby's exercise of the Warrant, and (2) Sabby has proved its claim against SuperCom for compensatory damages for breach of the Warrant.

### E.   Accrual of Damages

100. As noted above, shares resulting from the Warrant exercise were to be delivered T+2, that is, two trading days after delivery of the Notice of Exercise. (Warrant § 2(d)(i).) Here, that was Tuesday, March 23. Accordingly, the Court finds that SuperCom breached the Warrant on that date, and damages accrue from that date. Iroquois Master Fund, 2014 U.S. Dist. LEXIS 85442, at *1 (a warrant holder's breach of contract claim can accrue when the issuer fails to honor a valid exercise); Iroquois Master Fund, 641 F. App'x at 26 ("[T]he proper valuation for the [W]arrants was the date of the breach—the date [the issuer] failed to deliver the warrants.").

### 3.   SuperCom's Fraud and 10b-5 Claims

101. With respect to SuperCom's fraud and 10b-5 claims, it complains that:

> Sabby and Wedbush fraudulently sent emails to AST affirmatively, misrepresenting that SuperCom authorized the issuance of shares, despite the fact that [SuperCom] had rejected the notice and issuance of the shares. This was not true.

(Arie Trabelsi Testimony ¶ 55; see dkt. no. 1 ¶¶ 25, 47.)

> Sabby and Wedbush misled AST into believing they had SuperCom's approval and authorization to issue the shares to Sabby, and they also misled AST to believe that all proper AST requirements to use the rule 144 waivers were presented and approved. Overall, Sabby and Wedbush perpetuated a fraud, which resulted in the illegal transfer of 624,417 shares to Sabby.

(Arie Trabelsi Testimony ¶¶ 62-63.)[13]

102. In so arguing, SuperCom relies on several emails: on Tuesday, March 23, at 1:44 p.m., Mr. Grundstein wrote Doreen Pappas at to Wedbush saying: "please put up the DWAC receive [sic] described in the email below that I sent on Friday morning (and that you clearly received and replied to on Friday morning). Shares are due today. Hopefully the company will live up to [its] contractual obligations." (DX K at Supercom000354.)

103. Shortly after, at 2:05, Doreen at Wedbush wrote to Janice Santiago at AST: "DWAC deposit for 624,417 SPCB for Sabby has been posted, please have [AST transfer]." (DX L at SuperCom000346.)

104. At 10:46, Mr. Grundstein wrote Janice at AST: "Janice – for your reference I attach the email containing the cashless exercise that we submitted in accordance with the terms of the warrant on Friday morning – shares are due today. Please let us know if you require anything further." (DX M at Wedbush_00265.)

105. Mr. Grundstein also testified:

> Q. Now you write: Janice -- that's Janice Santiago at [AST], correct?
> A. Correct.
>  Q. Janice, for your reference, I attach the email containing the cashless exercise that we submitted in accordance with the term of the warrant on Friday morning. Do you see that?
> A. Yes.
> Q. You didn't tell her in this email, did you, that the exercise had been rejected?
> A. I did not.
> Q. Why does AST need the exercise to make the transfer?
> A. I assume it's something that they need in their files so that they can actually deliver the shares.
>  Q. You don't know that, do you?

---

[13] As noted above, Wedbush has been dismissed from the action. (Dkt. no. 118, 119.)

A. I do not.

Q. Once they get approval from SuperCom to make the transfer, they can make the transfer, correct?

A. Yes.

Q. If they need something for their files, it would be SuperCom's responsibility -- not only responsibility, it was SuperCom's role to provide whatever AST needed to make their transfer, correct?

A. Correct.

Q. They don't need it from you, correct?

A. Well, it was unprecedented that I was receiving emails from the CEO of the company telling me that they had not received the exercise notice.

(Tr. 257:13-258:15.)

Q. And you say the shares are due today. Is that to pressure a quick turnaround?

A. No. It's, if anything, that's intended for the company so that they honor the obligation. It's the same reason I added my litigation counsel at some point during this, so that they would hopefully realize it would make sense to honor this valid exercise to avoid further dispute.

(Tr. 259:5-11.)

106. Approximately two hours later, at 12:16, Wedbush wrote to AST again: "We do not see Sabby Volatility Warrant Master Fund's DWAC Deposit for 624,217 SPCB (SuperCom) being approved yet. Would someone from AST please provide an update?" (DX M at Wedbush_00265.)

107. Mr. Grundstein credibly explained the reason Sabby sent the complained of emails to AST was his concern that SuperCom would not honor Sabby's Warrant exercise:

Q. Then why did you send an email directly to AST other than to have AST transfer the shares?

A. At this point I was very hopeful that the company would approve the DWAC and recognize that they owed us the shares. And given our history with the registration rights and now with this conflict over our warrant exercise, I was sincerely concerned that this company would then later come back and tell us that we had somehow failed to do something, and they had attempted to deliver the shares. So I wanted to make sure that all I's were dotted and all T's were crossed and that the transfer agent had everything that she could possibly need from our side so that they could deliver the shares upon approval by the company.

Q. What other I's and T's needed to be dotted other than getting the company's approval for the transfer?

A. The company providing the exercise notice to the transfer agent.

Q. That's the company's role in this process, correct?

A. It usually is.

Q. And my point being, though, if the company -- you said you put up DWACs all the time, correct?
A. Correct.
Q. DWACs up. Transferring the shares is pretty easy after that, correct?
A. Should be.
Q. Once the company approves, there is no reason to think AST is going to have a problem transferring the shares, correct?
A. Correct.
Q. That's why you don't typically communicate with AST, correct?
A. Correct.
Q. So here you know the company doesn't approve the shares. I just want to understand your testimony. You know that they have rejected
 -- THE COURT: Counsel.
Q. You know that they have objected to the warrant exercise and rejected it, and you directly communicated with AST in the hopes that the company would change its mind. Is that your testimony?
A. It is.
Q. And it wasn't in order to try and convince or trick AST into sending the shares without company approval?
A. Absolutely not.

(Tr. 255:20-257:12.)

He also testified:

Q. . . . You sent an email directly to American Stock Exchange, correct? I'm sorry. American Stock Transfer.
A. Yes.
Q. When you sent this email, you knew full well that SuperCom had not approved the transfer, correct?
A. I believe that's correct, yes.
Q. They had rejected it, correct?
A. Yes.
Q. Yet, you are communicating directly with their transfer agent, which you don't typically do, correct?
A. I don't typically do it first, correct.
Q. I don't understand. Is it typical -- after you are aware a company has not approved a transfer, is it typical for you to then directly contact their transfer agent?
A. The company not approving the valid warrant exercise was unprecedented.

(Tr. 254:15-255:6.)

108. First, with respect to Rule 10b-5 and fraud, the Court finds that the emails SuperCom

complains of did not represent that SuperCom had approved the Warrant exercise and thus that they

did not amount to material misrepresentations or omissions sufficient to support claims for fraud or a

violation of Rule 10b-5. See Centro Empresarial Cempresa S.A., 17 N.Y.3d at 276 (an element of a claim for fraud is a false representation of a material fact); Halliburton Co., 573 U.S. at 286, 286 n.1 (an element of a private Rule 10b-5 claim is a material misrepresentation or omission).

109. Second, SuperCom asserts that the alleged misrepresentations/omissions were made to AST (dkt. no. 1 ¶¶ 25, 41), and Wedbush, (id. ¶ 47), not to Plaintiff SuperCom. Thus, SuperCom has not demonstrated reliance because fraud claims based on misrepresentations to third parties are not actionable under New York law unless those third parties serve as a "conduit to relay the false statements to plaintiff" and induce the plaintiff to rely. Pasternack v. Lab. Corp. of Am. Holdings, 27 N.Y.3d 817, 829 (N.Y. 2016) ("We . . . decline to extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff."). SuperCom does not claim, and has introduced no evidence showing, that it acted in reliance on any statement by Sabby, but that third parties did. This is insufficient as a matter of law.

110. Similarly, a 10b-5 claim fails "where the plaintiff does not allege that a defendant misled him concerning the value of the securities he sold or the consideration he received in return." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 96 (2d Cir. 2018) (cleaned up); Sarafianos v. Shandong Tada Auto-Parking Co., 2014 U.S. Dist. LEXIS 175551, at *13 (S.D.N.Y. Dec. 19, 2014) (fraud must "relate to an investment decision made by" plaintiff); Mfrs. Hanover Tr. Co. v. Smith Barney, Harris Upham & Co., 770 F. Supp. 176, 181 (S.D.N.Y. 1991) ("The in connection with requirement mandates that the alleged fraud concern the fundamental nature of the securities: namely, characteristics and attributes that would induce and investor to buy or sell the particular securities." (cleaned up)). SuperCom does not argue, and has not shown, that it was misled regarding the value of any security.

111. Even if the emails complained of constituted actionable misrepresentations or omissions, the Court finds Mr. Grundstein's testimony sufficient to dispel any suggestion of his knowledge of the

falsity of the alleged representation or of any intent to deceive. (see, e.g., Tr. 255:20-257:12.)

Accordingly, the Court finds that SuperCom has not proved its claims for fraud or a violation of Rule

10b-5. See Centro Empresarial Cempresa S.A., 17 N.Y.3d at 276 (an element of a fraud claim is

knowledge by the party who made the representation that it was false when made); Halliburton Co.,

573 U.S. at 267, 286 n.1 (an element of a private Rule 10b-5 action is scienter).

112. Finally, as noted above, Arie Trabelsi acknowledged that "Sabby returned the shares the

same day they were delivered." (Tr. 55:7-11.) Mr. Grundstein testified without contradiction "the

Wedbush transfer was not publicly reported and no one would have known about it except for the

parties involved. The shares were in Sabby's account for an hour or two and Sabby derived no

financial benefit from holding them for this brief period." (Grundstein Direct ¶ 31.) Thus, the Court

finds that SuperCom suffered no damage as a result of the Warrant exercise – a fact fatal to its

various claims regarding the Warrant exercise. See Centro Empresarial Cempresa S.A., 17 N.Y.3d at

276 (an element of a fraud claim is injury resulting from the alleged misrepresentation); Halliburton

Co., 573 U.S. at 267, 286 n.1 (an element of a private Rule 10b-5 action is economic loss); see also

The Experts, infra.

4. SuperCom's Negligence Claim

113. In its negligence claim, SuperCom alleges that Sabby had a duty to exercise the Warrant

"with reasonable care and in line with SEC regulations and applicable law" and that it breached that

duty by "exercising that Warrant without authorization." (Dkt. no. 1-1 ¶¶ 39-40.)

114. SuperCom has not demonstrated that Sabby owed it any such duties. As to SuperCom's

assertion that Sabby had a duty to exercise the Warrant "with reasonable care," this is

indistinguishable from Sabby's duty to abide by the terms of the Warrant.

115. To the extent SuperCom is asserting that SEC regulations and applicable law are the source

for Sabby's duty, an argument it has never developed, this assertion is without merit. "[T]he public's

interest in compliance with a statutory and regulatory scheme is not sufficient to" find an

independent duty. Verizon N.Y., Inc. v. Optical Commc'ns Grp., Inc., 91 A.D.3d 176, 182 (1st Dep't

2011). "Rather, tort liability arises out of catastrophic consequences that flow from a party's failure

to perform its contractual obligations with due care" and "does not result from an injury that, like the

harm [here], [is] solely financial and not typical of harm arising from tort." Id. at 177. (cleaned up).

116. As such, SuperCom "ha[s] failed to establish [a] duty" because it "ha[s] pointed to nothing to

show that th[e] relationship was anything beyond an ordinary arms-length business relationship

under a contract." Iroquois Master Fund, Ltd., 2011 U.S. Dist. LEXIS 31977, at *10-11 (cleaned up).

117. Furthermore, even assuming Sabby did have the duties SuperCom asserts, SuperCom has not

proven that Sabby breached these duties for the reasons set out above in Sections 2 and 3.

118. Consequently, the Court finds that SuperCom has not proved its negligence claim.

5.   SuperCom's Declaratory Judgment Claim

119. For the reasons set out above in Section 2, the Court finds that SuperCom has not proved its

claim for declaratory judgment.

VI.   The Experts

120. Assuming arguendo that SuperCom had proved its claims against Sabby, the Court rejects in

its entirety the expert report of Dr. Tal Mofkadi, SuperCom's expert.

121. First, Dr. Mofkadi's sole basis for any connection between SuperCom's alleged difficulties in

raising capital and/or any higher rates it might have paid[14] was Ordan Trabelsi's self-serving

explanation that these difficulties were due to Sabby's attempted warrant exercise of March 19 and

---

[14] "Q. Now, it's your expert opinion here that certain acts by Sabby caused an increase in interest
rates for SuperCom and a loss in value. Do I have that right?
A. Yes. The actions of Sabby created distress for SuperCom, which were affected by the facts that
they needed to raise cash via debt vehicle and not equity, and this debt was more expensive than
normal debt, and, again, the definition of normal is slightly general."
(Tr. 108:13-20.)

some "friction" thereafter.[15] Such unsupported assertions are not a proper basis for an "expert"

report.

122. Second, after avoiding answering whether his damages calculations began with a loan to

SuperCom February of 2021, (see Tr. 114:2-115:9), Dr. Mofkadi eventually conceded that he did

indeed include the February 2021 loan in calculating the damages allegedly caused by Sabby's

March 2021 activities – which occurred a month later – and that the March activities could not have

influenced the February loan. (Tr. 115: 5-17.)[16] If confirmation of the fallacious reasoning were

---

[15] "Q. What had somebody done, in your expert opinion, in February of 2021 that would cause this alleged loss?
A. There is a lot of discussion. I read a lot of things. I'm not saying that there is an expert, because that's a factual thing. That's a legal thing that needs to be decided. But a lot of actions by Sabby was impairing SuperCom's ability to borrow money from the market. There is a mail that I'm quoting in my report from October 2020 from Sabby sent to Ordan telling them that he is going to affect the ability to borrow money. There is a continuum of events that are affecting companies' ability to borrow money in the market.
Q. Isn't it your expert opinion that what was affecting SuperCom's ability to borrow money was litigation with Sabby?
A. I think that part of this is litigation, but it's not the only thing.
Q. What else is there that you are aware of as of February 2021 besides litigation?
A. That's what we call in economics friction. Every friction that you have with the large shareholder is impairing your ability to borrow money, exactly as I said. It's not just the litigation. It's the dispute. It's the fact that Sabby may, or at least that's the claims, informed other players in the market about SuperCom's actions, or whatever it is. Again, the general atmosphere that was created in this area.
Q. Have you seen any evidence that Sabby ever informed any other investor about anything regarding SuperCom?
A. I only saw evidence for the result and that's the discussions that I had with the COO Ordan and the email that I got from him with the feedbacks that he got from investment bankers.
Q. So it's your premise of your opinion that by February 2021, other investors knew about a conflict between SuperCom and Sabby and that impaired SuperCom's ability to raise equity?
A. Correct."
(Tr. 117:1-118:9.)
[16] "Q. Vertical number one.
A. Vertical number one is -- again, the conservative approach that I took in my report took the interest on those loans for two years' horizon.
Q. The interest that you quantified begins in February 2021.
A. I am not putting an exact date on the calculation. I just took two years and simply calculated 15 percent on those two years."
(Tr. 114:10-17.)

required, Sabby's expert, Zachary Michaelson, provided it. (See Tr. 330:5-13.)[17] The Court notes

parenthetically that Arie Trabelsi also insisted that Sabby's actions in March of 2021 affected

SuperCom's February 2021 capital raise. (See Tr. 70:2-71:5.)

123. Third, Dr. Mofkadi included in his damages calculation the supposedly higher interest costs

SuperCom paid on its February 2021 and June 2021 loans. (Tr. 112: 23-113:1 (two separate loans);

Tr. 115:10-13 (February 2021 loan included in damages).) But the terms of the June note were

substantially the same as the terms of the February note – issued before the events at issue. (Tr.

115:18-116:8.)

124. Dr. Mofkadi eventually conceded that what happened in March of 2021 did not affect

SuperCom's interest rates in June of 2021. (Tr. 116:9-12.)

---

[17] "Q. In the Mofkadi report, Mr. Mofkadi states that SuperCom paid an additional $3.6 million in interest under the February 2021 and June 2021 subordinated promissory notes. In your expert opinion, could Sabby's March 2021 attempted cashless exercise impact the interest rate of the February 2021 subordinated promissory note?
A. It's illogical. It's anachronistic.
Q. Why is that?
A. March comes after the month of February."
(Tr. 330:5-13.)

## VII.    Conclusion

125. For the reasons set out above, SuperCom has not proved any of its claims, and Sabby has proved its claim for liquidated damages for breach of the RRA and its claim for compensatory damages for breach of the SPA and the Warrant.

126. Counsel shall confer and submit a proposed form of judgment with damages calculated as provided above no later than November 15.

SO ORDERED.

Dated: October 31, 2023
New York, New York

*Loretta A Preska*

LORETTA A. PRESKA
Senior United States District Judge